UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDWARD PINEIRO,
      Petitioner,      :    Civil No. _____

  -v-                  :

DAVID L. WINN, Warden,    :
Federal Medical Center Devens  :
Ayer, Massachusetts,      :
      Respondent.        :

# 05-40077.NMG

================================================================

APPLICATION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO TITLE 28 U.S.C. §2241(c)(3)

================================================================

Edward Pineiro, pro se
Reg. No. 05792-084
FMC Devens
P.O. Box 879
Ayer, MA 01432-0879
Dated: March 25, 2005

FILING FEE PAID:
RECEIPT # 64373
AMOUNT $ 5.00
BY DPTY CLK KH
DATE 5-18-05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDWARD PINEIRO,<br>        Petitioner, | : | Civil No. _____ |
| | : | |
| -v- | : | |
| | : | APPLICATION FOR A WRIT OF |
| DAVID L. WINN, Warden, | : | HABEAS CORPUS PURSUANT TO |
| Federal Medical Center Devens | : |   28 U.S.C. §2241(c)(3) |
| Ayer, Massachusetts , | : | |
|        Respondent. | : | |

Most of us are familiar with the story of "The Wizard of
Oz." Dorothy and her dog Toto find themselves lost and on a
magical journey in the Land of Oz, striving to find the Great
Wizard of Oz in order to find their way home. Along the way they
meet and make allies with the Scarecrow, the Tin-Man, and the
Cowardly Lion. Together, they battle the forces of evil and the
Wicked Witch of the West, finally reaching the Wizard.

Once there, all but one are frightened of the all powerful
omnipresence of the Great Wizard with his smoke and mirrors
inage. Only Toto, dimunitive in size but possessing that
giagantic canine sense, has the courage and the vision to run up
to the box and pull back the curtain and reveal who the Great
Wizard really is: a man with a microphone and wise counsel.

In the end, Dorothy is told by the Good Witch that the way
home has always been within her, she just had to find out for her

self. Dorothy is told: "just click your heels three times and say, 'there's no place like home.'" Finally, Dorothy wakes up to find that the whole story was just a bad dream from a bump on the head.

On January 12, 2005, the U.S. Supreme Court in <u>United States v. Booker</u>, Slip. Op. No. 04-104, 543 U.S. __ (2005) pulled back the curtain of the all powerful Congress and the United States Sentencing Guidelines (USSG or Guidelines), to interpret and excise the unconstitutional parts of the Federal Sentencing Reform Act of 1984 (SRA or Act) as codified as the federal criminal statutes Title 18 U.S.C.S. 18 Section 3551 <u>et seq</u>. and 28 U.S.C.S. Section 991 <u>et seq</u>. The Act has, for the past 17 years or so since its operational start of November 1, 1984, reduced Article III judges to mere bean counters, "in effect mak[ing] a judge a computer." <u>See</u> quote of U.S.D.J. Franklin Billings, Vermont, attached as Exhibit "A".

The Act, as it was applied in violation of the Constitution prior to <u>Booker</u>, took away almost all discretion of Article III judges to fashion sentence for a criminal defendant that is right and just, and in harmony with what being a judge is all about. Thus, Title 18 U.S.C. §§ 3553(b) and 3742(e) have been excised.

2

Under the new interpretation of the statute, Article III judges are nc longer forced behind the curtain of the Guidelines - we are once again able to see the human being behind the black robe and get the justice of the wisdom of the men and women who sit behind the microphones. It is clear that the Booker interpretation of the statute is a holding that is retroactively applicable to cases on collateral review.

It is also clear from the holding in Booker that the Supreme Court, already unhappy with the frustrations and limitations that the mandatory Guidelines placed on Article III judges (so much so that many federal judges left the bench - see e.g., Judge John Martain, Jr., S.D.N.Y. leaving in 2004), finally had enough with the passing of the Feeney Amendment. This amendment, as the Court knows, further stripped Article III judges of their power to fashion sentences that are fair and just, changed the standard of appellate review on departures, narrowed what departures a judge could give, among other restrictions, and required all Article III judges who gave downward departures not based upon a criminal defendant being a government turncoat, get told on by the Attorney General to the House and Senate Judiciary Committees.

Indeed, licking his wounds from the Booker decision, Congressman Tom Feeney made a comment in regards to the Booker decision, denouncing the Supreme Court for placing "extraordinary power ... in the hands of a single judge" and "flying in the face of the clear will of Congress." See Time Magazine, 1/24/05, p. 31. Basta!, Mr. Feeney.

3

By making the Guidelines no longer mandatory for Article III judges to use and for recognizing the unconstitutional violations the mandatory Guidelines imposed upon criminal defendants, the Booker decision examines a criminal statute, saves it from being unconstitutional by excising the bad parts, and interprets what Congress meant all along.

### PRELIMINARY STATEMENT

Petitioner Edward Pineiro, Reg. No. 05792-084 (Pineiro or petitioner), acting pro se, hereby moves this Court pursuant to Title 28 U.S.C. § 2241(c)(3) to issue a Writ orf Habeas Corpus vacating his conviction and or sentence. Petitioner alleges that he is in custody in violation of the Constitution and laws of the United States.

In support of his application for a Writ of Habeas Corpus. petitioner states:

1.   Petitioner is being held in custody at the Federal Medical Center located in Ayer, Massachusetts. Petitioner is being made to serve a sentence of 262 months imposed upon him on September 9, 1998 by the Honorable James H. Michael, Jr., U.S.D.J., Western District of Virginia, Charlottesville Division. Petitioner's sentence was imposed after he pleaded guilty to violating the narcotics statutes. Further facts as to petitioner's conviction and sentence are set forth infra.

2.  Respondent, DAVID L. WINN, is the Warden of the Federal Medical Center, P.O. Box 880, Ayer, Massachusetts, 01432-0880 (FMC Devens).  As the Warden of FMC Devens, respondent is the official exercising charge and custody over petitioner.

Petitioner seeks an Order from this Court directing respondent to Show Cause as to why this Court should not issue a Writ of Habeas Corpus granting petitioner relief from his unlawful conviction and sentence.

### JURISDICTION

Petitioner invokes the jurisdiction of this Court under 28 U.S.C. § 2241(c)(3) and the U.S. Supreme Court's recent decision in Booker, supra.  As previously stated, petitioner alleges that the execution of his current imprisonment violates the Constitution and laws of the United States.

As set forth in Point III of the Arguments, 28 U.S.C. § 2241 (c)(3) invests this Court with jurisdiction to rule on the merits of petitioner's claims and grant relief.  Petitioner asserts that 28 U.S.C. § 2255 is inadequate or ineffective to test the legality of his detention.  See 28 U.S.C. ¶ 5.

Petitioner was sentenced in 1998 under the mandatory Guideline system that left no room to consider other factors. Petitioner applauds the Booker case and the release of Article

5

III judges from the burden and constraints of the mandatory guidelines and asks this Court to apply the retroactive interpretation of <u>Booker</u> to his case.

It has been a long journey for both judge and judged. However, like Dorothy learned, the answer has always been within all along. Prisoners filing from the inside and the Supreme Court rulings from within their power. Now, Article III judges are back [home] to a position of power where they were before the unconstitutional mandatory Guidelines and prisoners, while not quite home yet, are indubitably on the Yellow Brick Road.*

Petitioner clicks his heels here with a few arguments and more than one reason for the Court to rule favorably and apply <u>Booker</u> retroactively and resentence him. Petitioner will demonstrate why the Court may apply <u>Booker</u> retroactively. <u>See</u>, e.g., <u>Dodd v. United States</u>, 365 F.3d 1273 (11th Cir. 2004), <u>cert.</u> <u>granted</u>, 160 L.Ed.2d 456, "[A]ny court may make the retroactivity decision ... [b]ecause a petitioner need not wait for the Supreme Court to address the issue of retroactivity ." <u>Id.</u> at 1280.

---

\* Petitioner's reference to The Wizard of Oz is learned from existing case law and in line with cases where jurists have referenced stories in hundreds of opinions. <u>See</u> <u>e.g.</u>, <u>Mucaarello</u> <u>v. United States</u>, 524 U.S. 116, 141 L.Ed.2d 111, 118 S.Ct. 1890 (1998), referencing Robinson Crusoe, Moby Dick, The King James Bible, The Deserted Villiage, The Lost Legion, Bartlett Familiar Quotations, "the Magnificent Seven", M*A*S*H, and "Sesame Street"; <u>see</u> <u>also</u> <u>United States v. Pacheco</u>, 225 F.3d 198 (2nd Cir. 2000)(Minor, J)(quoting "Alice In Wonderland"). In point of fact, "Alice In Wonderland" has been found in over 473 published Opinions. <u>See</u> <u>National Law Journal</u>, 11/1/99; <u>Booker</u>, (SCALIA, J), dissenting opinion at 8, "Only in Wonderland."

## PROCEDURAL HISTORY

On May 21, 1997, a Grand Jury sitting in the Western District of Virginia at Charlottesville indicted Pineiro and codefendant Jose Sinencio Jorge for violations of the narcotics laws.

Count I alleged "[t]hat from on or about April 15, 1997 to on or about April 30, 1997, in the Western District of Virginia, the defendants ... as principals of as aiders and abettors, did knowingly and intentionally possess with intent to distribute cocaine base, a Schedule II controlled substance." 2. In violation of Title 21, United States Code, Section 841(a)(1) and 841 (b)(1)(A) (iii).

Count II alleged "[t]hat on or about April 15, 1997, in the Western District of Virginia, the defendants ... as principals or as aisers and abettors, did distribute cocaine base, a Schedule II controlled substance." 2. In violation of Title 21 United States Code, Section 841(a)(1) and 841(b)(1)(B)(iii).

On May 21, 1998, under a written plea agreement, Pineiro entered guilty pleas to both Counts of the indictment. Under the terms of the written plea agreement pursuant to Rule 11(e)(1)(A) and (B), Pineiro agreed that the relevant conduct for the quantity of cocaine base would be between 150 and 500 grams of cocaine base. The government agreed to recommend the low end of the guideline range. Id.

7

There was no agreement that Pineiro was subject to the Career Offender provisions of the Guidelines under U.S.S.G. § 4B1.1. Pineiro was sentenced to 262 months imprisonment as a Career Offender under § 4B1.1.

Pineiro filed a notice of appeal to the U.S. Court of Appeals for the Fourth Circuit following his sentence. On July 21, 1999, the Fourth Circuit affirmed the judgment of conviction. Pineiro then filed to the U.S. Supreme Court for a writ of certiorari. That application was denied on November 1, 1999.

Pineiro is not clear exactly when he next filed his § 2255 motion because the papers have been lost through the years by prison officials and he is not able to tell from the docket sheet entries. Pineiro does know that his § 2255 motion was denied in then district court on April 24, 2001. The Fourth Circuit denied a certificate of appealability in an unpublished opinion, United States v. Pineiro, No. 01-6981 (4th Cir. 12/18/01).

On May 9, 2002, in a per curiam unpublished order, the Fourth Circuit dismissed Pineiro's appeal for a Motion to include New Ruling addressing breach of plea agreement by non-fulfillment of promise. See United States v. Pineiro, No. 01-8057.

All of the claims presented in this applicatio have not been addressed. Pineiro has sought no further relief through any court as to his unlawful sentence. Ordinarily, Pineiro would be required to bring the present claims on § 2255, such a remedy is inadequate and ineffective to test the legality of his detention.

8

## SUMMARY OF THE ARGUMENTS

Petitioner's first argument shows that the Supreme Court decision in Booker, supra, has narrowed the scope of the criminal statute 18 U.S.C. § 3551, et seq., by interpreting its terms and Congress' intent. Thus, Booker is retroactively applicable to cases on collateral review.

Petitioner next argues that Booker modified the Guidelines nunc pro tunc and are retroactively applicable to cases on colateral review. After that, petitioner presents a further statutory argument for the retroactivity of Booker.

In subsection B of Argument I, petitioner argues that Booker and the holding in Blakely v. Washington, 542 U.S.___, 159 L.Ed.2d 403 (2004) demonstrate the substantive change in law abd thus, Booker is retroactively applicable to cases on collateral review. Petitioner follows this argument with reasons why Booker further clarifies the retroactivity to cases on collateral review.

Further in Argument I, petitioner demonstrates how the holding of Schiro v. Summerlin, 542 U.S. ___, 159 L.Ed.2d 442 (2004) shows how Booker is retroactively applicable to cases on collateral review.

Petitioner's second argument, II A, argues the application of Booker in the converse, that Booker is a watershed rule that passes the Teague v. Lane, 489 U.S. 288, 103 L.Ed.2d (1989) second exception and is retroactively applicable to cases on collateral review.

9

In part B of Argument II, petitioner argues that the holding of Tyler v. Cain, 533 U.S. 656, 150 L.Ed.2d 632 (2001), shows that Booker is retroactively applicable to cases on collateral review, Petitioner then presents an argument that Booker is a Guidelines clarifying amendment.

In Argument III, petitioner demonstrates that 28 U.S.C. § 2255 is inadequate or ineffective to test the legality of his detention. See 28 U.S.C. § 2255 ¶ 5. Petitioner will show that he must be permitted to proceed under 28 U.S.C. § 2241 in order to avoid a constitutional question. See Triestman v. United States, 124 F.3d 361, 377 (2nd Cir. 1997) ("[W]e encourage the district courts to find that habeas corpus relief may be sought whenever situations arise in which a petitioner's inability to obtain collateral relief would raise serious questions as to § 2255's constitutionality").

Petitioner in Argument IV will demonstrate "cause and prejudice" in the event the government argues procedural default of the claims presented herein. See Sustache-Rivera v. United States, 221 F.3d 8 (1st Cir. 2000) ("cause and prejudice standard applies ... to habeas actions brought under § 2241 ...") Id. at 17. Petitioner will demonstrate that under Reed v. Ross, 468 U.S. 1, 82 L.Ed.2d 1 (1984) and the Second Circuit's rational expressed in Ingber v. Enzor, 841 F.2d 450, 454 (2nd Cir. 1988), petitioner should be excused for any such default.

Should this Court find, however, that petitioner's instant

10

instant claims could have been brought at the time of his plea of guilty or direct appeal, petitioner will demonstrate that counsel was ineffective for failing to raise the issues.

Lastly, petitioner will show in Argument V that his sentence of 262 months is unlawful. Although at the time of sentencing petitioner's counsel stipulated to specific quantities of cocaine base, petitioner argues that this stipulation was the product of misinformation provided by the court, the government and counsel. As Justice Stevens wrote in Bousley v. United States, 523 U.S. 614, 140 L.Ed.2d 828 (1998): "The fact that all of [petitioner's] legal advisors acted in good-faith reliance on existing precedent does not mitigate the impact of that erroneous advice. Its consequences for petitioner were just as severe, and just as unfair, as if the court and counsel had knowingly conspired to deceive him in order to induce him to [enter into the stipulation and plea] to a crime he did not commit." Id. at 140 L.Ed.2d 842 (STEVENS, J., concurring in part and dissenting in part).

Petitioner will argue that in light of Booker, the career offender enhancement that he was sentenced under must be vacated. Petitioner did not admit to his past convictions nor did he plead guilty to a violation of U.S.S.G. § 4B1.1.

11

## I. A.  The Holding in <u>Booker</u> Creates a Substantive Change In 18 U.S.C. § 3553 Requiring Retroactivity

Petitioner argues that the <u>Booker</u> decision, <u>supra</u>, creates a substantive change in the SRA, modified as amended to the federal criminal statute 18 U.S.C. §.3551 <u>et seq.</u>, and 28 U.S.C. § 991 <u>et seq.</u>, making the Guidelines advisory and no longer mandatory. Petitioner argues here that the Supreme Court's decision in <u>Booker</u> has narrowed the scope of the criminal statute 18 U.S.C. § 3553 by interpreting its terms and thus, <u>Booker</u> applies retroactively to cases on collateral review.

### 1.  Applicable Law

It has long been established, as Justice Stevens wrote in <u>Bousley v. United States</u>, 523 U.S. 614, 140 L.Ed.2d 828, 118 S.Ct. 1604 (1998): "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision giving rise to that construction." <u>Id.</u> at 140 L.Ed.2d 842 (Stevens, J,. concurring in part and dissenting in part)(citation omitted). Indeed, "[T]he Supreme Court does 'not express a new rule of constitutional law ... [when] it [] interprets a substantive criminal statute using rules of statutory construction.'" <u>United States v. Brown</u>, 117 F.3d 471, 479 (11th Cir. 1997)(citation omitted).

It was also stated in <u>Bousley</u> that: "This case does not raise any questions concerning the possible retroactive

application of a new rule of law, cf. Teague [], because our decision in Bailey v. United States, [] ... merely explained what § 924(c) had meant ever since the statute was enacted." Bousley, 140 L.Ed.2d at 841 (Stevens, J.).

Just as Bailey explained what § 924(c) had meant since its enactment, Booker works upon the SRA and 18 U.S.C. § § 3553 and 3742 in the same manner. And, just as Bailey was applied retroactively on collateral review, Booker too must be applied in the same manner and for the same reasons expressed in Bousley as regarding the decision in Bailey.

### 2.  Discussion

While new rules of criminal procedure are reviewed under the doctrine announced in Teague v. Lane, 489 U.S. 288, 103 L.Ed.2d 334, 109 S.Ct. 1000 (1989), "[n]ew substantive rules generally apply retroactively [on collateral review] ... This includes decisions that narrow the scope of a criminal statute by interpreting its terms." Schiro v. Summerlin, 542 U.S. ___, 159 L.Ed.2d 442, 448, 124 S.Ct.___ (2004)(citing Bousley)(emphasis in original); see also United States v. Mandicini, 205 F.3d 519 (2nd Cir. 2000) (a new rule of substantive criminal law is presumptively retroactive).

As Bousley teaches:  "... Teague by its terms applies only to procedural rules, we think it is inapplicable to the situation in which this Court decides the meaning of a criminal statute enacted by Congress." 140 L.Ed.2d at 938.

13

Backwards, forwards, sideways or upside down, there is no question that the second question in Booker narrowed the scope of a criminal statute [18 U.S.C. §§ 3553 & 3742] and in effect, changed the meaning of a federal criminal statute. Before Booker, the Guidelines were mandatory for Article III judges to obey. After Booker, the Guidelines are advisory. As Booker states:

> We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C.A. § 3553(b)(1)(Supp. 2004), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, § 3742(e) ... So modified, The Federal Sentencing Act ... makes the Guidelines advisory.

Booker, Opinion of the Court in part, p. 2, Breyer, J.

Relevant to our discussion here is a Second Circuit holding regarding another case where the U.S. Supreme Court interpreted a federal criminal statute. In United States v. Thomas, 274 F.3d 655 (2nd Cir. 2001), the Court commented about a challenge made by Thomas in an earlier appeal (United States v. Thomas, 204 F.3d 381 (2nd Cir. 2000)(Thomas II)), that Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), mandated reversal of their convictions . The Jones Court decided the meaning of the federal carjacking statute 18 U.S.C. § 2119.

As the Court noted in Jones: "[O]ur decision today does not announce any new principle of constitutional law, but merely interprets a particular federal statute in light of a set of constitutional concerns that have emerged through our decisions over the past quarter century." 143 L.Ed.2d 311, n. 11. The

14

Second Circuit stated: "[W]e held that Jones applied only to the particular statute interpreted in the case and did not, generally, rewrite the law regarding what facts must be determined by a jury rather than a judge." 274 F.3d at 655 (citation and internal quotation omitted).

In the case sub judice, Booker, as applied to the SRA, has rewritten the law regarding what facts must be determined by a jury rather than a judge and changed the meaning of a federal criminal statute, making the Guidelines advisory. Booker is retroactively applicable to cases on collateral review.

As the Booker Court further stated:

> [S]everability questions[] can arise when a legislatively unforseen constitutional problem requires modification of a statutory provision as applied in a significant number of instances. Compare e.g., Welsh v. United States, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in result)(explaining that when a statute is defective because of its failure to extend to some group a constitutionally required benefit, the court may "either declare it a nullity" or "extend" the benefit "to include those who are aggrieved by exclusion").

Booker, Opinion of the Court, BREYER, J., p.4.

Petitioner was sentenced in 1998 under a provision of a statute that was unconstitutionally defective. It failed in 1998 to extend to petitioner the constitutionally required benefits of the Sixth Amendment, i.e., "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime in which he was charged," see In re Winship, 397 U.S. 358, 364, (1970), "the right to demand that a jury find

15

him guilty of all the elements of the crime with which he is
charged, see <u>United States v. Gaudin</u>, 515 U.S. 506, 511 (1995),
and the Sixth Amendment violation of the imposition of an
enhanced sentence under the Guidelines based on the sentencing
judge's determination of a fact that was not found by the jury
or admitted by the defendant. See <u>Booker</u>, Slip. Op. No. 04-104.

Petitioner has been aggrieved of a longer prison sentence
and a longer term of supervised release than constitutionally
called for. As such, petitioner asks the Court to "extend the
benefit [of <u>Booker</u>] to include [petitioner] who [is] aggrieved
by the exclusion." <u>Booker</u>, Opinion of the Court, Breyer, J.,
p.4. Petitioner asks to be resentenced under the [now]
constitutional provisions of the SRA.

But wait, there's more! In plain English, the <u>Booker</u> Court
shows that the bad dream is really over and the bump on the head
has gone down (like the mandatory Guidelines):

> As the Court today recognizes in its first opinion
> in these cases, the existence of § 3553(b)(1) is a
> necessary condition of the constitutional violation.
> That is to say, without this provision - namely the
> provision that makes "the relevant sentencing rules
> ... mandatory and impose[s] binding requirements on
> all sentencing judges" - <u>the statute falls outside
> the scope of Apprendi's</u> requirement.

<u>Booker</u>, Breyer, J., Opinion of the Court at 16 (citation
omitted, emphasis added). Thus, it is a foregone conclusion
that because <u>Booker</u> and the now constitutional SRA fall outside
the scope of <u>Aprendi's</u> requirement, we don't confuse the issue
here because <u>Booker</u> applies retroactively to cases on colateral
review.

**Booker modified the Guidelines Nunc Pro Tunc to Nov. 1, 1987**

By remedially severing and excising parts of the SRA akin to legislating (see e.g., Freeborn v. Smith, 69 U.S. 160, 168, 17 L.Ed 922, 175, 2 Wall 160 (1865)), the Supreme Court in Booker modified the Federal Sentencing Guidelines nunc pro tunc to their November 1, 1987 effective date:

> We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C.A. § 3553(b)(1)(Supp 2004), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, § 3742(e) (main ed.and Supp. 2004), which depends upon the Guidelines' mandatory nature. So modified, the Federal Sentencing Act, see Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 et seq., 28 U.S.C. § 991 et seq., makes the Guidelines effectively advisory.

Booker, BREYER, J., Slip. Op. at pg. 2.

Congress' power to make or amend remedial statutes retroactively absent Ex Post Facto problems is unquestionable. See Freeborn v. Smith, supra, 69 U.S. at 168, 17 L.Ed at 923,("We do not question the validity of retrospective statutes that are purely remedial"); see also Frisbie v. Whitney, 76 U.S. 187, 19 L.ed 668, 9 Wall 187 (1869).

Retroactivity thereby is simply a matter of intent. See e.g., Rivers v. Roadway Express, 511 U.S. 298, 311, 128 L.Ed.2d 274, 278, 114 S,Ct. 1510(1994)("The question is whether Congress

has mandated such an intent."). Because in Booker it is the Supreme Court which remedially modified the SRA as "Congress would have intended" (BREYER, J., Slip. Op. at 25) had it known in 1984 its mandatory Sentencing Guidelines violated the Sixth Amendment (id., p. 22)("we have examined the statute in depth to determine Congress' likely intent in light of today's holding.")(emphasis in original), Booker's indisputable intent to modify the Guidelines nunc pro tunc is dispositive.

**The Supreme Court has made Booker Retroactive**

Finally, even if the Supreme Court did not assume Congress' role in modifying the SRA, in construing and interpreting it as "Congress would have intended" (BREYER, J., Slip. Op. at 25) had it known its mandatory Sentencing Guidelines violated the Sixth Amendment (id. at 22), the Supreme Court has necessarily made Booker retroactive.

Like Booker, the Supreme Court in Patterson v. McLean Credit Union, 491 U.S. 164, 105 L.Ed.2d 132, 109 S.Ct. 2363 (1989) interpreted a 123 year-old statute differently than appellate courts had done since its enactment. As to Patterson's retroactivity, the Court said:

> A judicial construction of a statute is an authoritive statement of what the statute meant before as well as after the decision of the case giving rise to that construction[]. Thus Patterson provides the author-itative interpretation of the phrase 'make and enforce contracts' in the Civil Rights Act of 1866 before the "Congressional[ 1991 amendment [overruling Patterson] went into effect on November 21, 1991. [Patterson's]

18

> interpretation provides the base line for our
> conclusion that the 1991 amendment would be
> 'retroactive' if applied to cases arising before
> that date.

Rivers, supra, 511 U.S. at 313, 128 L.Ed.2d at 289.

Unlike Rivers which rejected retroactivity of the relevant Congressional Amendment because it was not so intended by Congress, the Supreme Court's judicial construction or interpretation of the SRA is inescapable because "the Court has no authority to depart from the congressional command setting the [November 1, 1987] effective date of [the] law [] it has enacted." Rivers, id. at n. 12.

Booker ends up helping final cases, which Congress has so desperately tried to make immutable, more than others and have concluded this result was unintentional. Booker discusses all of the defense windfalls and complexities other Guideline holdings would have had and concluded its Guideline amendments better express Congress' intent in light of its Sixth Amendment holding.

Final sentences will be limited by Double Jeopardy, see, e.g., United States v. Velasco-Heredia, 319 F.3d 1080, 1085-1087 (9th Cir. 2003) and Due Process, see e.g., Webster v. Woodford, 361 F.3d 522, 526 (9th Cir. 2004) strictly to the maximum the jury found beyond a reasonable doubt or admitted to by the defendant.

It is simply an adjustment commensurate with proper proof. Ironically, their benefit is but a consequence of an otherwise practical middle ground decision erroneously interpreted by many as pro-government.

B.                    **Booker** and **Blakely Demonstrate**
                     **The Substantive Change In Law**

Petitioner argues here that the decision in <u>Blakely v.</u>
<u>Washington</u>, 542 U.S. ___, 159 L.Ed.2d 403, 124 S.Ct.___(2004)
further bolsters the holding in <u>Booker</u> that the new rulings
present a substantive change in law requiring retroactive
application to cases on collateral review. Petitioner also
argues that this holding, in concert with <u>Booker</u>, demonstrates
that <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 147 L.Ed.2d 435, 120
S.Ct. 2348 (2000) is applicable to cases on collateral review
and that the Courts of Appeals are in error ruling otherwise.

### 1.  Applicable Law

In <u>Blakely</u>, <u>supra</u>, the Supreme Court held that because the
facts supporting the petitioner's exceptional sentence were
neither admitted by the petitioner nor found by the jury, the
sentence violated his Sixth Amendment right to a trial by jury.
<u>Blakely</u> involved a determinate sentencing scheme under
Washington State law that is similar to the Federal Sentencing
Guidelines.

In <u>Booker</u>, <u>supra</u>, the Court answered two questions. The
second question excised the unconstitutional parts of the SRA
[Title 18 U.S.C. §§ 3553(b)(1) and 3742(e)] and made the
Guidelines advisory. Artilce III judges now have the power
[back] to fashion sentences that are fair and just within the
maximum and minimum set by statute for the offense of conviction
within the Sixth Amendment's provisions. <u>See</u> <u>ante</u>, I-A.

The first question answered in Booker was "Whether the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines [USSG] based on the Sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant?"  The Court answered that question in the affirmative.

### 2.  Discussion

It has long been established that the Constitution guarantees criminal defendants the right to a trial by jury, and the right to have every element of the offense proved beyond a reasonable doubt.  As Justice Stevens wrote for the Court in Booker:

> It has been settled throughout our history that the Constitution protects every criminal defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). It is equally clear that the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." United States v. Gaudin, 515 U.S. 506, 511 (1995).

Id., Slip Op. No. 04-104 (Opinion of the Court in part, Stevens, J), p. 5 (emphasis added).

Nothing new here.  Jury instructions that allow a jury to convict without finding every element of the offense violate In re Winship's requirement that every fact necessary to constitute the crime must be proven beyond a reasonable doubt.  See

21

Sandstrom v. Montana, 442 U.S. 510. 521-524 (1979). Nothing new there either. However, as we have seen since these cases, the Supreme Court has determined that the failure of the trial court to submit a required element to the jury is subject to the harmless-error and plain-error analysis. See Johnson v. United States, 520 U.S. 461 (1997) and Neder v. United States , 527 U.S. 1 (1999).

Important to our discussion here is the constitutional protections criminal defendants retain - proof beyond a reasonable doubt of every fact necessary to constitute the crime with which they are charged and the right to demand that a jury find him guilty of all the elements of the crime with which he is charged. What happens when these "protections" fail? What remedy exists when judges are forced to use unconstitutional statutes to sentence a defendant?

As Booker teaches, it has evolved from the holdings in Gaudin, Winship, Jones v. United States, 526 U.S. 227 (1999), Apprendi, Ring v. Arizona, 536 U.S. 584 (2002) and Blakely, supra. All of these cases helped in the Booker decision.

Ring was before Blakely and was held to be a new rule of constitutional law not applicable on collateral review. See Schiro v. Summerlin, ante. Ring was a death penalty case requiring that aggravating factors necessary for the death penalty be found by a jury. Ring also altered the range of permissible methods for determining whether a defendant's conduct was punishable by death. The Court in Schiro held that rules that

22

allocated decision making authority in this fashion were prototypical procedural rules.

Booker, in contrast, and Apprendi have not regulated the manner of determining a defendant's culpability. That has always been the function of the jury. Instead, both Booker and Apprendi have clarified the law.

Even though every U.S. Circuit Court of Appeals has ruled that Apprendi does not apply retroactively to cases on collateral review, See Lilly v. United States, 342 F.Supp.2d 532, 538 n.4 (W.D. Va. 2004) (citing cases), that doesn't mean they are correct. The Second Circuit in Coleman v. United States, 329 F.3d 77 (2nd Cir. 2003) is a member of this band, as they have joined the chorus. As Justice Stevens wrote in Booker about Apprendi:

> The simple answer, of course, is that we were only considering a statute in that case; we expressly declined to consider the Guidelines. See Apprendi, 530 U.S. at 497, n.21. It was therefore appropriate to state the rule in that case in terms of a "statutory maximum" rather than answering a question not properly before us.

Booker, (Stevens, J., Opinion of the Court in part) p. 14, (emphasis added).

In Apprendi, as explained in Booker, the Supreme Court was only considering a statute. Although Apprendi was decided in the context of New Jersey's hate crimes statute, its holding was not

23

limited to that statute, as the cases that have followed have demonstrated. Apprendi's holding encompasses a substantive construction based on constitutional concerns of any statute that treats facts that increase the penalty for a crime beyond the prescribed statutory maximum as a sentencing factor rather than as an element of the crime.

Indeed, the Sixth Circuit recognized that after Apprendi, § 841 sets forth "three different crimes with three differing elements (weight of drugs), and with three substantially different penalty structures." See United States v. Flowal, 234 F.3d 932, 938 (6th Cir. 2000). Again, Justice Stevens give insight in Booker:

> More important than the language used in our holding in Apprendi are the principles we sought to vindicate. Those principles are unquestionably applicable to the Guidelines. They are not the product of recent innovations in our jurisprudence but rather have their genesis in the ideals our constitutional tradition assimilated from the common law.

Slip. Op. 04-104 (Stevens, J., Opinion of the Court in part), p. 14 (citation omitted, emphasis added). Thus, there is nothing new about Apprendi or Booker or the constitutional rights they vindicate, "they are not the products of recent innovations." Id.

Booker now clarifies the error Coleman and all the other Circuits made. Coleman also created in what Judge Selya* would

---

\* Judge Bruce M. Selya, First Circuit Court of Appeal.

admire in the usage of words, a new legal term - "element was used as "shorthand for a set of procedural requirements."    329 F.3d at 86 (emphasis added). This writer is amazed and in awe as to how reasonable jurists are able to slice and dice the meaning of words to bend them and shape them into what they want.   Shorthand, not a "real element", even though every Circuit declared drug quantity as an element of the offense, see United States v. Thomas, 274 F.3d 655, 663 (2nd Cir. 2001), and now include these "not real element(s)" in all indictments.

It's either black or it's white, day or night. Why is it that the Courts of Appeals and the government get to have it both ways?   Petitioner avers that Coleman's interpretation "reaches too far into the mist."

Booker shows that Judge Parker Jr. had it right in his concurrance in Coleman, speaking about the substantive rule announced in Apprendi:

> The procedural aspect of this rule - that every element of a crime must be submitted to the jury and proved beyond a reasonable doubt - obviously did not originate with Apprendi, as it has been imbedded in American constitutional law for more than two hundred years ... Apprendi's innovation was not in identifying the procedures that apply to an element of a crime but, rather, in redefining what constitutes an element of a crime.  After Apprendi, an element is any fact (other than a prior conviction) that increases the penalty for a crime beyond the statutory maximum.

Coleman, 329 F.3d at 91.

Further support is found in <u>Blakely</u>: "Our commitment to <u>Apprendi</u> in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no <u>mere</u> <u>procedural</u> <u>formality</u>, but a fundamental reservation of power in our <u>constitutional</u> <u>structure</u>." 159 L.Ed.2d at 415 (SCALIA, J), (emphasis added).

Thus, the right to a jury trial is not just a "mere procedural formality" rather it's a "fundamental reservation of power in our constitutional structure." Structure and not mere procedural formality - indeed, a substantive rule in law.

In <u>Neder v. United States</u>, 527 U.S. 1, 144 L.Ed.2d 35 (1999), the Supreme Court identified two types of trial errors, structural and non-structural. <u>Id.</u> at 144 L.Ed.2d 50 ("Under our cases, a constitutional error is either structural or it is not."). Unlike <u>Neder</u> which dealt with flawed jury instructions, <u>Blakely</u> addressed a defendant's fundamental right to a jury trial; a right as no mere procedural formality but rather one of structure. Structural errors create "a defect affecting the framework within which the trial proceeds". ,,, [and which] "infect the entire trial process." <u>Id.</u> at 46 (citations omitted).

Since <u>Blakely</u> challenged the exceptional sentence at the trial court level, the Supreme Court would have applied harmless error review if <u>Blakely</u> announced a procedural rule. Instead, it reversed and remanded without stating a standard of review. This indicates <u>Blakely</u> suffered a structural error, resulting in automatic reversal.

As case law holds for purposes of retroactivity analysis, a substantive change is one that alters the meaning of a criminal statute. Bousley, supra, 523 U.S. 614, 620. It is no accident that the Blakely majority explained how Apprendi changed the meaning of 21 U.S.C. § 841:

> Any evaluation of Apprendi's "fairness" to criminal defendants must compare it with the regime it replaced, on which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, see 21 USC §§ 841(b)(1)(A), (D), ... based not on facts proved to his peers beyond a reasonable doubt...

159 L.Ed.2d at 419 (fn. omitted). It's real simple. Before Apprendi, the Second Circuit held that drug quantity was not an element of a : 841 offense. See United States v. Monk, 15 F.3d 25, 27 (2nd Cir 1994). After Apprendi, drug quantity is an element. See Thomas, supra, 274 F.3d at 663.

How the Coleman majority states that "[t]he rule announced in Apprendi ... did not effect a change in the meaning of a federal criminal statute," 329 F.3d at 87, is puzzling. More puzzling, the majority states: "drug quantity has been an "element" of a section 841 offense - i.e., it has been something that the government must prove to obtain a conviction under 841(a) [] [and] [a]fter Apprendi, the prosecution is not required to prove any facts that it was not required to prove before." Id. Huh?

Coleman was decided wrong. Booker, through Blakely and Apprendi, shows that the new rule is substantive and is retroactively applicable to cases on collateral review, like petitioner's.

### 3.    Further Clarification from Booker

A revealing passage from Bousley adds insight into our quest for understanding today: "[w]e do not believe that Teague governs this case. The only constitutional claim made here is that the petitioner's guilty plea was not knowing and intelligent. There is surely nothing new about this principle ..." 140 L.Ed.2d at 838 (citation omitted, emphasis added). The same is true about the case sub judice, Apprendi, Blakely, and Booker: there is nothing new about the Sixth Amendment right to a trial by jury and to have all the facts necessary to construe the crime proved beyond a reasonable doubt.

Pre-Guidelines, all safeguards of the Constitutional Sixth Amendment right to a jury trial were always met in every case. The jury convicted, the judge sentenced. The defendant pleaded guilty, was sentenced on that omission and not enhancements not admitted to. In 1986, the federal criminal system became a runaway train. As Booker states: [[i]n 1986, however, our cases first recognized a new trend in the legislative regulation of sentencing when we considered the significance of facts selected by legislatures ...[that] mandated [] heavier sentences than would otherwise have been composed ." Booker, (STEVENS, J), Opinion of the Court, p. 11 (citation omitted, emphasis added).

Sparked by whatever paranoid delusions that Congress had to "get tough on crime", (see e.g., the death of Len Bias, and the June, 1986 Mandatory Minimums for drug offenses passed in

the dark of night), the new trend in sentencing and federal law created an unconstitutional system that took away the Constitution's protection of the Sixth Amendment's right to a jury trial and due process of law under the Fifth Amendment.

As Justice Scalia mad note in Apprendi: "since Winship we have made clear beyond peradventure that Winship's due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" Apprendi, 147 L.Ed.2d at 451 (SCALIA, J, dissenting)(citation omitted). In sum, the Guidelines removed from the jury the assessment of facts that increased the prescribed range of penalties to which a criminal defendant is exposed.

In 1999, the Supreme Court in Jones finally slowed the train down, eventually stopping it in 2000 with Apprendi: "In sum our reexamination of our cases ... confirms the opinion that we expressed in Jones ... [w]e endorse the statement of the rule set forth in the concurring opinions in that case: It is unconstitutional for a legislature to remove from the jury the assessment of facts that increases the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." Id. at 455 (citation and internal quotations omitted)(emphasis added).

29

Like Dorothy, we now find that the answer has been ther along, the answer lies within Apprendi: Apprendi endorsed the statement of the rule set forth in Jones. Jones stated that "[O]ur decision today does not announce any new principle of constitutional law , but merely interprets a particular federal statute..." Jones, 143 L.Ed.2d at 331, n. 11. Thus, the "rule" set forth in Jones (a case that interpreted a federal statute and has been applied retroactively) is a substantive rule that Apprendi adopted when the Court considered the New Jersey statute, like Justice Stevens explained in Booker. See ante at 18.

Since Booker also adopted that substantive rule and interpreted a particular federal criminal statute, Booker is retroactively applicable to cases on collateral review. As Booker teaches:

> As it this became clear that sentencing was no longer taking place in the tradition that Justice Breyer invokes, the court was faced with the issue of preserving an ancient guarantee under a new set of circumstances.[] ...[a]nd it is the new circumstances, not tradition or practice that the new circumstances have superseded, that have led us to the answer first considered in Apprendi, ...[I]t is an answer not motivated by Sixth Amendment formilism, but by the need to preserve Sixth Amendment substance.

Booker, No. 04-104, (Stevens, J., Opinion of the Court in part), p. 12 (emphasis added). It's a substance preservation concern, not a formialism or procedure concern. The new circumstances, the Guidelines, had a couple of bad apples in the bunch, constitutionally invalid apples, 18 U.S.C. §§ 3553(b)(1) and 3742(e).

30

Booker is not a procedural change but a constitutional interpretation of the law which is substantive in nature. Booker is strictly a Sixth Amendment case. The reasonable doubt standard derives from the Fifth Amendment under Winship. The sentencing statutes do not set forth a set standard of proof - the preponderance standard comes from Chapter 6 of the Guidelines. Schiro, supra, reasoned that retroactivity of Ring did not apply because judge determinations beyond a reasonable doubt were sufficiently reliable.

Justice Thomas' footnote 6 in his dissent in to Justice Breyer's opinion in Booker in which he quotes Chapter 6 regarding the Commission's belief that the preponderance standard applies clarifies: "The Court's holding today corrects this mistaken belief." Id. The federal sentencing statutes should be construed to avoid the difficult constitutional question on whether harsher sentencing violated due process when the greater punishment was based on less than an admission of proof beyond a reasonable doubt. This requires the guidelines and commentary to fall under Stinson v. United States, 508 U.S. 36 (1993), in which the Supreme Court found that statutes govern over inconsistent guidelines.

The transformation of the Guidelines into an advisory system works a substantive alteration in federal sentencing law in terms of the sentence outside the Guidelines. Booker does not just affect sentencing procedures but the actual sentence that can be imposed. The Second Circuit in United States v. Crosby, No. 03-1675, 2.02/05, recognizes the first part of Booker as "the Substantive Opinion." Id. at 13. No more is needed.

31

By making the Guidelines mandatory and taking away facts that need to be pleaded in an indictment and proven to a jury beyond a reasonable doubt, facts that were always a part of the ancient guarantee and were only abused and misused with the invent of the SRA, federal criminal defendant's Sixth Amendment and Fifth Amendment due process rights were violated. The whole structure of the proceedings were infected with error.

A horse is a horse of course, of course. If you take a black horse and paint white stripes on it and call it a zebra, it's still really a horse. You can fool some people. But one day, as Bob Dylan sang, "a hard rain is gonna fall," and the white stripes will wash off. Booker rained on the Guidelines, washing off the white stains of the mandatory imposition of an unconstitutional interpretation of the Sixth Amendment and due process.

Let the men and women in the black robes, entrusted as the guardians and custodians of our Constitution, mount the black stallion proudly, once again carrying the tourch of the Sixth Amendment with its restored luster - and do what judges do when it is time:  fashion sentences that are fair and just and in harmony with the Constitution.

32

### 4. Summerlin Shows Booker's Retroactivity to § 2255

Schriro v. Summerlin, supra, provides compelling support for Booker's retroactivity to initial habeas cases. Even though the Supreme Court in Summerlin rejected retroactivity of its new procedural rule announced in Ring v. Arizona, 536 U.S. 584 (2002) (holding a jury, not a judge, must make the findings necessary to impose death penalty), it did so because the possibility of inaccuracy was minimal in that both fact finders there were required to use the same beyond a reasonable doubt standard.

Pre-Booker, judges determined sentence enhancement facts by a preponderance of the evidence standard. Post-Booker, those facts must be both determined by a jury and proved beyond a reasonable doubt or admitted to by the defendant. Accordingly, pre-Booker the fact finding process so "'seriously diminsishe[d]' accuracy as to produce an "impermissibly large risk of injustice." Summerlin, 159 L.Ed.2d at 451 (emphasis in original).

The Booker rule which remedied that risk is thus most likely exempt from the Teague, supra, retroactivity bar under the watershed rule of criminal procedure exception. See Winship, supra, 397 U.S. 358; cf Ring, 536 U.S. 584, discussed in Summerlin; see also, infra, II A.

Booker invalidated the mandatory guidelines both on a Sixth Amendment jury trial violation as well as the Apprendi due process doctrine. Jointly, those form the basis for retroactivity.

33

Moreover, Summerlin's reliance on DeStafano v. Woods, 392 U.S. 631, 20 L.Ed.2d 1308, 88 S.Ct. 2093 (19680 (per curiam) (refusing to give retroactive effect to Duncan v. Louisiana, 391 U.S. 145, 20 L.Ed.2d 491, 88 S.Ct. 1444 (1968)(applying Sixth Amendment jury trial guarantee to the states)) to reject retroactivity is inconsequential to Booker's retroactivity.    In DeStafano, like Summerlin, the fact finding standard on which retroactivity was claimed was the same, only the fact finder differed.    Booker changed those standards exactly as did Winship, 397 U.S. at 363-64, 25 L.Ed.2d at 375 (requiring juvenile charges be proved beyond a reasonable doubt instead of preponderance, reasoning the reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error.    The standard provided concrete substance for the presumption of innocence - that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law'").

Since the foundation of Booker's new rule of constitutional law rests both the Apprendi due process doctrine and teh Winship Sixth amendment right to a jury trial with respective beyond a reasonable doubt proof standards, retroactivity to initial habeas corpus petitions is a given.

How else would the Supreme Court make up for all the years that criminal defendants were denied the basic guarantees of the Constitutional rights to the Fifth and Sixth amendments. Booker is how and retroactivity is applicable to § 2255 motions.

34

**II.A.**                    **Booker Is A Watershed Rule That
                         Passes the Second Teague Exception**

Petitioner argues here that assuming _arguendo_ that _Booker_,
_supra_, is a new procedural rule, it is a watershed rule of
criminal procedure implicating the fundamental fairness and
accuracy of the criminal proceeding and passes the second part of
the _Teague_ test.

### 1.   Applicable Law

In _Graham v. Collins_, 506 U.S. 461, 478, 122 L.Ed.2d 260,
113 S.Ct. 892 (1993) it was explained that the second exception
in _Teague_ is for "watershed rules of criminal procedure
implicating the fundamental fairness and accuracy of the criminal
proceedings." _Id._  _Teague_, _supra_, also holds that a case
announces a new rule "if the result was not _dictated_ by precedent
existing at the time the defendant's conviction became final ."
489 U.S. 301 (emphasis in original). Generally, "unless
reasonable jurists hearing [a] petitioner's claim at the time his
conviction became final would have felt compelled by existing
precedent to rule in his favor, we are barred from doing so now."
_Graham_, _supra_, 122 L.Ed.2d at 270 (citation omitted).

In _Beard v. Banks_, 540 U.S. 668, 159 L.Ed.2d 494, 129 S.Ct.
__ (2004), in regards to the second _Teague_ exception, the Court
said:

> it is clearly meant to apply onlt to a small core
> of rules requiring observance of those procedures that
> ... are implicit in the concept of ordered liberty

35

> [B]ecause any qualifying rule would be so
> central to an accurate determination of innocence
> or guilt [that it is] unlikely that many such
> components of basic due process have yet to emerge
> ... it should come as no surprise that we have yet
> to find a new rule that falls under the second
> <u>Teague</u> exception.

159 L.Ed.2d at 506 (citations and internal quotation marks omitted).

The only "rule" to emerge so far that squares with the second <u>Teague</u> exception is the right to counsel found in <u>Gideon v. Wainwright</u>, 372 U.S. 335, 9 L.Ed.2d 799, 83 S.Ct. 792 (1963), "and only [] this rule." <u>Id.</u> "<u>Gideon</u>, it is fair to say, "alter[ed] our understanding of the <u>bedrock procedural elements</u> essential to the fairness of a proceeding." <u>Id.</u> at 507 (citation and internal quotation marks omitted) (emphasis in original).

## 2.  Discussion

The list is long of the fallen cases that have failed trying to pass through the eye of the needle of the limited scope of the second <u>Teague</u> exception. See <u>Tyler v. Cain</u>, <u>supra</u> at 533 U.S. 656, 667, n. 7, 150 L.Ed.2d 662, n. 7, 121 S.Ct. 2478 (2001) (collecting cases). What, exactly do these cryptic words "bedrock procedural elements" mean? And if the only case so far that is "watershed" and "bedrock" is over 41 years old, will there ever be such another case that passes the second <u>Teague</u> exception? The New Millennium calls for new action. The time is now for the rules of <u>Jones</u>, <u>Apprendi</u>, <u>Blakely</u>, and <u>Booker</u>, <u>supra</u>, to be applied retroactively to <u>all</u> cases on collateral review.

The Supreme Court has stated that the Sixth Amendment's Confrontation Clause is a "bedrock procedural guarantee [that] applies to both federal and state prosecutions." Crawford v. Washington, __U.S.__,, 158 L.Ed.2d 177, 187 (2004)(citation omitted)(emphasis added). Indeed, the Supreme Court has:

> referred to the right of confrontation as one of the fundamental guarantees of life and liberty and a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States.

Pointer v. Texas, 380 U.S. 400, 404, 13 L.Ed.2d 923, 926, 85 S.Ct. 1065 (1965)(citation and internal quotation marks omitted; emphasis added). And so too, another "bedrock procedural guarantee" rooted in the Sixth Amendment is the right to a jury trial and proof beyond a reasonable doubt.

The proof beyond a reasonable doubt guarantee has been called a "bedrock, axiomatic and elementary [constitutional principle." See Winship, 397 U.S. at 363. Since 1970, the due process and associated jury protections of Winship extend to some degree to "the length of "a criminal defendant's] sentence." Apprendi, 147 L.Ed.2d at 451 (Scalia, J., dissenting). Since Booker, Blakely, Apprendi, and Jones, supra, evolved from the holdings of Guadin and Winship, supra.

The legislative and judicial actions of the mandatory use of the Guidelines meant that the guarded protections of the Sixth Amendment's fundamental guarantees essential for the due protection of life and liberty were thwarted. This is why the Court in Apprendi "confirm[ed] the opinion that we expressed in

37

<u>Jones</u> ... "[w]e <u>endorse</u> the <u>statement</u> of the <u>rule</u> set forth in the concurring opinions in that case:  It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 147 L.Ed.2d at 455 (citation  and internal quotation marks omitted)( emphasis added).

Since the unconstitutional interpretations of the drug statutes before <u>Booker</u>, <u>Blakely</u>, <u>Apprendi</u>, and <u>Jones</u> were forced on Article III judges by the unconstitutional mandatory Guidelines, federal criminal procedings in drug cases were submitted to juries without the quantity of drugs proven beyond a reasonable doubt.  In addition, federal criminal defendants were sentenced by the preponderance of the evidence standard and not by facts proven beyond a reasonable doubt and jury trial. Like its paternal twin the Confrontation Clause, the jury trial guarantee is a "bedrock procedural guarantee" rooted in the Sixth Amendment.

The Supreme Court has acknowledged that the proof beyond a reasonable doubt standard can significantly inpact the factfinding accuracy and society's confidence in the result. See <u>Winship</u>, <u>supra</u>, at 397 U.S. 363, 364; <u>Ivan V. v. City of New York</u>, 407 U.S. 203, 205 (1972)("to overcome an aspect of a criminal trial the substantially impairs the truth-finding function); <u>Hankerson v. North Carolina</u>, 432 U.S. 233 (1977). Since <u>Winship</u> in 1970, at least five Justices have said that

sentence enhancements are of significant importance to warrant application of the reasonable doubt standard. See Jones, Apprendi, Blakely, and Booker, supra. Schiro, supra, is of no concern here because Schiro only addressed the allocation of factfinding of responsibility between judge and jury. There is a second component to Blakely/Booker that Schiro did not address and that is that facts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt rather than by a preponderance of the evidence.

Although Winship, Ivan V., and Hankerson predate the retroactivity standing in Teague, their teachings are instructive for our inquiry here. Now that Booker, Blakely, Apprendi, and Jones have opened our eyes to the unconstitutional application of the mandatory Guidelines that violated the Sixth Amendment, they have "altered our understanding of the bedrock procedural elements essential to the fairness of a proceding."

When the Guidelines were mandatory [and unconstitutional], judges made decisions which affected the "statutory maximum" sentence using a preponderance of the evidence standard, even though the Constitution demanded proof beyond a reasonable doubt in such a mandatory system. Since courts made such decisions using a far less fair and accurate standard of proof, the rule in Booker was necessary to the "fundamental fairness of the sentencing phase of the criminal proceding and improves the accuracy of the criminal process."

39

The Sixth Amendment, being the mother of the paternal twins the Confrontation Clause and the Right to a Jury trial with proof beyond a reasonable doubt, is "guarded against legislative and judicial action by provisions in the Constitution of the United States." See Pointer v. Texas, ante, at 29. We know that the Confrontation Clause is a "bedrock procedural guarantee," see id., it is reasonable to conclude that the right to a jury trial is also a "bedrock procedural [element] guarantee." For these years the Guidelines have been mandatory, our understanding of the Sixth Amendment has been unguarded by the leglislative and judicial actions of the mandatory Guidelines and the actions that Article III judges were forced to take implementing those unconstitutional mandatory Guidelines.

Booker has altered our understanding of this bedrock procedural [element] guarantee. It is a watershed rule that passes the second Teague exception. The first one in over 41 years. It is time to declare so and correct the unconstitutional sentences that many federal prisoners have that are on collateral review.

Congressmen, judges, prosecutors are sworn to uphold the Constitution. With all due respect, if they intend to pay more than lip service to their oath, they must address the constitutional deprivation that has occurred to many federal and state offenders. Based on policy, principles of constitutional jurisprudence and fundamental fairness, Booker cries out for retroactive application to cases on collateral review. Faithfully, Article III judges are listening.

**B.**        **The Holding In <u>Tyler v. Cain</u> Shows That**
              **<u>Booker</u> Is Retroactively Applicable**

Petitioner argues here that <u>Booker</u> is retroactively applicable to cases on collateral review through various cases and the holding in <u>Tyler v. Cain</u>, <u>supra</u>. Without specifically saying so and using the exact words "made retroactively applicable to cases on collateral review," the Supreme Court may do so through multiple cases.

### 1.  Applicable Law

"The only way the Supreme Court can, by itself, lay out and construct a rule's retroactive effect ... is through a holding." <u>Tyler</u>, <u>supra</u>, 150 L.Ed.2d 642 (internal quotation marks omitted). According to <u>Tyler</u>, the Supreme Court can make new rules retroactive (1) by declaration, (2) by application of the rule to a <u>habeas</u> case (<u>see</u> <u>id.</u> at 645), or (3) through multiple holdings which "necessarily dictate retrocativity of the new rule[]" (<u>id.</u>, at 645-47 (O'CONNOR, J., concurring).

### 2.  Discussion

The Supreme Court has held or recognized that new rules are entitled to fully retroactive effect, applicable to cases on collateral review. <u>See</u> <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956) (indigent appellant's right to a free transcript); <u>Hamilton v. Alabama</u>, 368 U.S. 52 (1961)(accused's right to counsel at arraignmant); <u>Gideon v. Wainwright</u>, <u>supra</u>, (right to counsel at

41

trial); Douglas v. California, 372 U.S. 352 (right to counsel on appeal); Jackson v. Denno, 378 U.S. 368 (1964)(judicial procedures for determining the voluntariness of a confession); Ivan V., supra, (giving retroactive effect to Winship); Mullaney v. Wilber, 421 U.S. 684 (1975)(extending Winship); see also Yates v. Aiken, 484 U.S. 211 (1988)(applying Francis v. Franklin, 471 U.S. 307 (1985) through Sandstrom v. Montana, 442 U.S. 510 (1979)(retroactively applicable because Francis did not announce a "new" rule and was not a clear break with prior law in Sandstrom).

Booker specifically declared "both the Sixth Amendment holding and [its] remedial interpretation of the Sentencing Reform Act (SRA) [retroactive] to all cases on direct review." BREYER, J., Slip Op. at 25. Instead of limiting retroactivity only to cases on direct review, like Mr. Booker's and Mr. Fanfan's, by that statement the Supreme Court more likely made Booker retroactive to all cases.

This is so because Booker's Sixth Amendment new rule simply "reaffirm[ed][its] holding in Apprendi: [that] [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id., STEVENS, J., Slip. Op. at 20. That rule is but a magnification of its Winship rule "that the Constitution protects every criminal defendant 'against conviction except beyond proof beyond a reasonable doubt of every fact necessary to constitute the crime with wich he is charged." Id. at 5.

42

In _Ivan V._, _supra_, the Supreme Court declared _Winship_ must
"be given complete retroactive effect." 407 U.S. 205. _Ivan V._
was also a direct appeal case like _Booker_. However, the Supreme
Court's declaration left no doubt its retroactivity declaration
meant retroactivity to all cases, final or otherwise.

Proof of it is in the several _habeas_ cases in which the
Supreme Court subsequently applied variations of its _Winship_
rule. See _e.g._, _Yates v. Evatt_, 500 U.S. 391, 114 L.Ed.2d 432,
111 S.Ct. 1184 (1991)(applying rule in _Sandstron_, _supra_, that
jury instructions on malice or intent violated due process by
relieving the state's burden of proving every element beyond a
reasonable doubt as required by _Winship_); _Francis v. Franklin_,
_supra_; _Jackson v. Virginia_, 443 U.S. 307, 61 L.Ed.2d 560, 99
S.Ct. 2781 (1979)(applying _Winship_ to insufficiency of evidence
standards of review in _federal habeas corpus_ proceedings).

In addition, by so applying the _Winship_-type rule to
multiple _habeas_ cases, the Supreme Court has arguably also _de_
_facto_ applied its _Booker_ constitutional rule through those past
cases. If _Booker_ and _Winship_ are rules of the same type,
application of one to _habeas_ proceedings is application of the
other thus making both retroactive under _Tyler v. Cain's_
application of retroactivity method. _Id._ 533 U.S. 665, 150
L.Ed.2d at 645. But, _cf._ _In re Turner_, 267 F.3d 225 (3rd Cir.
2001)(rejecting same argument as to _Apprendi_).

Moreover, it is similarly possible the Supreme Court made
its _Booker_ constitutional rule retroactive through its multiple
holdings because it held in "Case One [_Ivan V._] that [_Winship_]

43

Booker's amendment accordingly merely clarified Congress' intent in light of its Sixth Amendment holding. Had Booker "superimpos[ed] its [Sixth Amendment] constitutional requirement announced [therein]" (id., pg. 3) by "engraft[ing] the Court's constitutional requirement onto the sentencing statutes, [it] would [have substantively] destroy[ed] the system[]", id., pg. 9.

Such substantive change would have produced unintended identical punishment for different degrees of similar crimes (id.) and vise-versa (id. pg. 10) thus destroying Congress' goal of sentence uniformity (id.). Because the Booker Sentencing Reform Act amendments did not change the Guidelines substantively but merely interpreted them as advisory instead of mandatory, such an amendment is only a clarifying amendment and should be applied retroactively.

In addition, Bookers's additional amendment to the sentencing appellate process also changed nothing substantively. It only clarified the standard of review Congress would have preferred in light of its Sixth Amendment holding. Retroactivity of such changes for cases on collateral review is hardly a problem. See e.g., Collins v. Youngblood, 497 U.S. 37, 111 L.Ed.2d 30, 110 S.Ct. 2715 (STEVENS, J., concurring).

Although not exactly am amendment to the Guidelines as technically listed by the usual means, the Booker decision may certainly be construed as stated above. Petitioner realizes that this argument is novel, however, petitioner argues it is viable.

III.  **28 U.S.C. §2241 Is The Only Available Remedy To Test The legality Of Petitioner's Conviction and Sentence**

Petitioner concedes that ordinarily §2255 would be the appropriate means to test the legality of his conviction and or sentence. However, petitioner's claims do not meet the requisites to obtain permission to prosecute a second or successive §2255 motion. Petitioner's claims are not based upon newly discovered evidence, (§2255 ¶8(1)), nor are petitioner's claims based upon a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable to petitioner to test the constitutionality and lawfulness of his conviction and or sentence.

**A.  Applicable Law**

Petitioner argues that the Second Circuit's rulings in Treistman, supra, and Jiminian v. Nash, 245 F.3d 144 (2nd Cir. 2001), along with the First Circuit's decision in Sustache-Rivera v. United States, 221 F.3d 8 (1st Cir. 2000) establish beyond cavil his entitlement to seek relief from his unlawful conviction and or sentence through the historical Writ of Habeas Corpus, codified at Title 28 U.S.C. §2241.

**B.  Discussion**

Petitioner's instant claims stem from the recent U.S. Supreme Court's decision in Booker, supra. In Booker, the Court

46

strengthened its rule first made in Jones, Apprendi, and Blakely, supra:  that the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact [by a preponderance of the evidence] (other than a prior conviction) that was not found by the jury or admitted by the defendant.  The Booker Court also excised two parts of the SRA to make the Guidelines advisory and no longer mandatory.

Another bright line foundation to emerge from the Jones, Apprendi, Blakely, and Booker holdings is that drug quantity is now treated as an "element" of the crime and pleaded in an indictment. See Thomas, supra, 274 F.3d 668, n. 14 (collecting cases).  Accordingly, since at the time of petitioner's guilty plea in 1998 the drug statutes were being construed in a manner as to disregard essential "elements" of the offenses and because the courts were using the unconstitutional mandatory Guidelines (which included the Career Offender, § 4B1.1), petitioner's instant claims stem from the effect upon these statutes cause by the Jones, Apprendi, Blakely and Booker holdings.

Still more recently, the U.S. Supreme Court case United States v. Shepard, Slip. Op. No. 03-9168 (decided March 7, 2005) further mandates that petitioner be allowed to proceed under §2241. Shepard is a clarification of Taylor v. United States, 495 U.S. 575 (1990) that defined what a judge may look to in finding past convictions for an Armed Career Criminal Act (ACCA) sentence under Title 18 U.S.C. § 924(e)(1).

47

Just as in Treistman, "to the extent that [petitioner] relies on the Fifth [and Sixth] Amendment[s] and the rule[s] that [an indictment must contain all of the elements of the offense, facts that enhance a defendant's sentence must be determined by a jury or admitted by the defendant and the scope of judicial factfinding is constrained to the record], his claim is constitutional but not new; and to the extent t hat he relies on [Jones, Apprendi, Blakely, Booker and Shepard] his claim is new but not constitutional." Treistman, 124 F.3d at 372. The result in this case must, therefore, mirror the result in Treistman: Petitioner must be permitted to bring his claims under §2241.

The Second Circuit spoke to this same issue in Jiminian v. Nash:

> [W]hen presented with a §2241 petition raising previously available claims appropriately the subject of a §2255 motion, district courts should construe the petition as a second or successive §2255 motion and transfer it to this Court for certification so long as the prisoner had a prior §2255 motion dismissed on the merits.

245 F.3d at 148.

The underlying premise in Jiminian is that if a prisoner brings a petition labeled as a §2241 petition, courts must determine whether the issues presented were previously available. If so, the §2241 petition may properly be converted to a §2255 motion and would therefore, be subject to the AEDPA's amendments to §2255.

48

On the other hand, _Jiminian_ strongly suggests that if the prisoner's claims were not available at the time of his original §2255 motion, a §2241 petition is the proper method to test the legality of his detention. This rational is was the catalyst for the Second Circuit's decision in _Triestman_: "[c]ertainly a defendant cannot be expected to assert a claim he does not know exists and cannot anticipate." 124 F.3d at 369, n. 8 (citations omitted).

Thus, petitioner argues that §2255 is inadequate and/or ineffective to test the legality of his detention and that he must be allowed to invoke the "savings clause" of §2255. Again, _Jiminian_ is instructive on the "inadequate or ineffective" part: "[w]e now hold that §2255 is not inadequate or ineffective ... simply because a prisoner cannot meet the AEDPA's gatekeeping requirements, provided that the claim the prisoner seeks to raise was previously available on direct appeal or in a prior §2255 motion. 245 F.3d at 147-148. Petitioner respectfully asks the Court to see the law in this way.

As to the "savings clause" part of §2255, the First Circuit has remained silent on this matter but has touched on parts of it in a couple of cases. In _United States v. Barrett_, 178 F.3d 34 (1st Cir. 1999), the Court stated: "Yet the §2255 savings clause, which has been interpreted to avoid constitutional questions about § 2255, must mean something ... We agree with the [Seventh, Third,and Second Circuits] that habeas corpus relief

49

[under §2241] remains available for federal prisoners in limited circumstances." 178 F.3d at 50-52 (citations omitted).

A few years later, in deciding whether or not to issue an application for a second or successive § 2255 petition, the First Circuit again touched upon without deciding the meaning of the savings clause: "The savings clause has most often been used ... to present an argument that under a Supreme Court decision overruling the circuit courts as to the meaning of a statute ... The savings clause has to be resorted to for ... statutory claim[s]. See Suctache-Rivera, supra, 221 F.3d 16.

Because the claims petitioner raises in this petition would have been futile under existing precedent prior to Booker, he must be allowed to proceed under § 2241. Because denying petitioner the opportunity to present his claims would raise serious questions as to the constitutionality of § 2255, petitioner respectfully asks the Court to be persuaded by those Circuits that hold that the savings clause permits review of a petitioner's challenge, in the interests of justice, which is otherwise barred under § 2255, and allow him to proceed under § 2241.

This approach is in the spirit of the law. See e.g., Triestman, supra (holding savings clause applies in "cases in which the petitioner cannot for whatever reason, utilize § 2255 ... or else "in those extraordinary circumstances where justice demands"); In re Dosainvil, 119 F.3d 245, 251 (3rd Cir. 1997) (savings clause applies in the "unusual circumstance" where denial of a further petition would result in a miscarriage of justice").

IV.                    **Cause and Prejudice**

Petitioner's previous arguments have been jurisdictional in nature. As such, those arguments can never be waived. However, petitioner anticipates that the government will argue that he has procedurally defaulted his arguments as to the execution of his unlawful sentence and must demonstrate cause and prejudice sufficient to warrant this Court reaching the merits of his claims. Petitioner's arguments meet the cause and prejudice test of United States v. Frady, 456 U.S. 152, 71 L.Ed.2d 816, 102 S.Ct. 1584, reh den. (US) 73 L.ed.2d 1296, 102 S.Ct. 2287 (1982).

### A.    Applicable Law

In Peck v. United States, 73 F.3d 1220 (2nd Cir. 1995)(rev'd on other grounds), the Second Circuit stated: "We believe it appropriate to establish a bright line rule that will not 'encourage appeal[s] ... of well-settled points of law.'" Id. 1226. The U.S. Supreme Court in Reed v. Ross, 468 U.S. 1, 82 L.Ed.2d 1, 104 S.Ct. 2901 (1984) held that a federal habeas corpus petitioner was able to show cause for failing to raise a novel constitutional issue in state court. The Court stated: "[T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which [the cause] requirement is met." Id. 82 L.Ed.2d at 14.

## B. Discussion

At the time of petitioner's procedings it was firmly entrenched throughout the country in 1998 that drug quantity was not an element of a drug offense under § 841(a)(1). Based upon counsel's advise, petitioner stipulated to a drug quantity of 150 grams to 500 grams of cocaine base. Further, the unconstitutional use of the mandatory Guidelines was what Article III judges were forced to use. Any attempt to raise an argument to the contrary would have been futile.

In Ingber v. Enzor, 841 F.2d 450 (2nd Cir. 1988), the Court was asked to determine whether a defendant may be denied the benefit of a new rule of law on collateral attack if that rule is announced after the time for an appeal has expired. In answering the question the Court wrote: "Were we to penalize [the petitioner] for failing to challenge such entrenched precedent, we would ascribe to attorneys and their clients the power to prognosticate with greater precision than the judges of this court." Id. at 454-55. The Court further stated: "we see no value in imposing a responsibility to pursue such a patently futile course." Id.

The Supreme Court established the basis for this reasoning years earlier in Ross:

> Despite the fact that a constitutional concept may ultimately enjoy general acceptance ... when the concept is in its embryonic stage, it will, by hypothis, be rejected by most courts... [A] rule requiring a defendant to raise a truly novel issue is not likely to serve any functional purpose.

82 L.Ed.2d at 14. Thus, petitioner establishes cause in the instant case for failing to raise the issues presented herein.

Clearly, any attempt by petitioner to argue the points listed ante would have been to argue against "well-settled points of law." Petitioner should not now be penalized for failing to forsee what courts and Congress failed to notice: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." Apprendi, 147 L.Ed.2d at 455.

Moreover, he cannot be faulted for failing to argue that the mandatory Guidelines were unconstitutional and that the Sixth Amendment is violated by the imposition of an enhanced sentence under the Guidelines based upon a sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant. See Booker, ante. As to the prejudice prong of the Frady standard, petitioner relies in his arguments set forth in Point V.

If, however, this Court finds that petitioner's claims to be procedurally defaulted, such default must be attributed to counsel. Although petitioner argues that his claims are "so novel that [their] legal basis [was] not readily available to counsel", United States v. Scott, 218 F.3d 835, 839 (8th Cir. 2000), if the court concludes otherwise, counsel's performance must be deemed to have been ineffective. See Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 694, 104 S.Ct. 2052 (1984).

Moreover, if counsel's performance was ineffective then the prejudice to petitioner stemming from counsel's errors is

evident.  See Point V, infra.; see also Glover v. United States, 531 U.S. 198, 148 L.Ed.2d 604, 121 S.Ct. 696 (2001) (6 to 12 month prison term increase sufficient to find prejudice under Strickland). As will be demonstrated, the error in petitioner's sentence is far more egregious than the error found to constitute prejudice in Glover.

Accordingly, should the Court hold petitioner's claims to be procedurally defaulted under Frady, such a holding would be, in this case, tantamount to a finding that counsel was ineffective under the standards announced in Strickland. Thus, under either Frady or Strickland, petitioner's claims are justiciable at this time.

**V.**              **Petitioner's Sentence is unlawful**

Petitioner was sentenced under the Career Offender provisions of the unconstitutional mandatory Guidelines found at U.S.S.G. § 4B1.1. His Criminal History Category was scored to be a Category IV.  See attached Exhibit "B", sentencing transcript. With the stipulation to 150 to 500 grams of cocaine base attributable to petitioner, his level under U.S.S.G. § 2D1.1 scored to be a level 34.

However, under the not admitted to by petitioner fact of Career Offender, petitioner's Criminal History category was determined to be Category VI with an offense level of 37. Petitioner was granted a three level decrease for acceptance of

54

responsibility which brought petitioner back to level 34. The guideline range scored to be 262 to 327 months imprisonment.

The government, as part of the plea agreement, agreed to recommend that defendant be sentenced at the low end of the applicable guideline range. See exhibit A, ¶6. However, at the sentencing proceedings, AUSA Hudson stated: "[W]e'd ask the Court now to sentence him within the appropriate guideline range of 262 to 327 months." See exhibit B, p. 10. Not quite a recommendation of the low end.

Moreover, it cannot be said that petitioner's plea was knowingly and intelligently made since he was not told that drug type and quantity are elements of the crime that the government would have to prove. Before accepting a plea of guilty, the District Court must address the "core concerns" of F.R.Crim.P. 11: 1) the absence of coercion; 2) an understanding of the charges; and 3) knowledge of the consequences of the guilty plea. United States v. Isom, 85 F.3d 831, 835 (1st Cir. 1996).

In light of the holdings in Jones, Apprendi, Blakely and Booker, supra, we know know that at the time of petitioner's plea and sentencing, counsel's advice to stipulate to a specific quantity of cocaine base (based upon the erroneous interpretation of 21 U.S.C. § 841(a)(1)) and the use of the unconstitutional mandatory guidelines was the product of misinformation provided by the Court, the government and counsel. The fact that all the parties, i.e., counsel, the Court, and the government acted in good-faith is not enough to carry the day for the government.

Supreme Court case law speaks upon this very point: "The fact that all of [petitioner's] legal advisors acted in good-faith reliance on existing precedent does not mitigate the impact of the erroneous advice. Its consequences for petitioner were just as severe, and just as unfair, as if the court and counsel had knowingly conspired to deceive him in order to induce him to [enter into the stipulation and] plead guilty to a crime he did not commit." Bousley, supra, 140 L.Ed.2d at 842 (STEVENS, J., concurring in part and dissenting in part). Powerful words from a powerful man and instructive to our case at hand.

Aside from the government breaking it's word at sentencing to recommend the low end of the guideline range and aside from petitioner being mislead as to his plea, petitioner asks the Court to fix the unconstitutional sentence he is now serving. The prejudice is clear in light of Booker and Shepard, supra.

Without the unconstitutional Career Offender enhancement which was not plead to or admitted to by the petitioner, his Criminal History category is IV. His offense level is level 34 minus three points for acceptance of responsibility. At Category IV and level 31, his guideline range is 151-188 months imprisonment. Far less than the 262 months imprisonment petitioner is serving.

The Court has the power to resentence petitioner and dispose of the matter as law and justice require. See United States v. Treistman, 178 F.3d 624, 630 (2nd Cir. 1999) ("[D]istrict court had the authority under § 2243). Petitioner respectfully asks to be resentenced in the 151-188 range.

## CONCLUSION

The Writ should be granted.

                              Respectfully submitted,

                              Edward Pineiro, pro se
                              Reg. No. 05792-084
                              FMC Devens
                              P.O. Box 879
                              Ayer, MA 01432-0879
                              Dated: March 25, 2005

========================================================

# EXHIBIT A

========================================================

*Filed in open court*
*21 May 1998,*
*H. Wheeler*
*Deputy Clerk*

U.S. ATTORNEY'S OFFICE

May 27  1 37 PM '98

CHARLOTTESVILLE, VA

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA       :
                               :
        v.                     :        Criminal No.
                               :
                               :
EDWARD ALLEN PINERO            :
     a/k/a "Jose Fontaine"     :

### PLEA AGREEMENT

Come now the defendant and the United States of America, by their respective Counsel, and beg leave of the Court to tender this proposed plea agreement, and jointly request and move the Court to accept the guilty plea of the defendant in accordance with this agreement and pursuant to Rules 11(e)(1)(A) and (B) of the Federal Rules of Criminal Procedure:

1.   The parties wish to reiterate that, pursuant to Rule 11(e)(6), nothing the defendant may have said in the course of negotiating this agreement may be offered as evidence against him in any proceeding.

2.   The defendant reaffirms that he has been advised of, and understands, that he has, until conviction, the absolute right not to discuss any matters with agents of the government, that he has discussed his individual case with an attorney, and that his attorney has fully advised him of all rights and possible defenses he may have had in this matter.

3.   This agreement constitutes the full and complete understanding among the parties.

43

4. EDWARD ALLEN PINERO hereby tenders his plea of guilty to Counts One, Two, and Three of the Indictment filed in this Court, thereby accepting responsibility for conspiring to distribute crack cocaine, with possessing crack cocaine with intent to distribute, and with distribution of crack cocaine, all as set forth in the Indictment. The statutory maximum penalty for Count One is life imprisonment and a fine of $4,000,000, with a minimum mandatory statutory penalty of 10 years. The statutory maximum penalty for Count Two is life imprisonment and a fine of $4,000,000, with a minimum mandatory statutory penalty of 10 years. If the defendant has a prior felony drug conviction, the minimum mandatory statutory penalty for Counts One and Two is 20 years. The statutory maximum penalty for Count Three is 40 years imprisonment, with a minimum mandatory statutory penalty of 5 years, and a fine of $2,000,000. If the defendant has a prior felony drug conviction, the minimum mandatory statutory penalty for Count Three is 10 years.

4. The United States agrees that EDWARD ALLEN PINERO, "a/k/a Jose Fontaine" will have "accepted responsibility" within the meaning of that term under the sentencing guidelines, if this agreement is accepted by the Court, and will urge the Court to reduce the sentencing guideline range by three levels in recognition of PINERO's early decision to plead.

5. The parties agree that the "relevant conduct" for which PINERO should be responsible under the sentencing guidelines is between 150 and 500 grams of cocaine base, or "crack" cocaine.

6. The United States will recommend at sentencing that the

2

defendant be sentenced at the low end of the applicable guideline range.

7.   At such time as the defendant enters his guilty plea pursuant to this agreement, the United States will move to withdraw its Information establishing its intent to seek an enhanced penalty pursuant to Title 21, United States Code, Section 851(a)(1).

8.  It is fully understood that the sentence to be imposed in this case is within the sole and complete discretion of the sentencing judge.  The government cannot and does not make any express or implied promises or representations as to what sentence will be imposed.  The United States agrees to make known to the sentencing judge any cooperation and testimony the defendant may have rendered.

9.   The parties agree that this is one of the cases in which Title 18, United States Code, Section 3143(a)(2) requires the Court to detain the defendant pending sentencing.

10.   The parties agree that PINERO is subject to the provisions of the Sentencing Guidelines for this offense, and therefore ask the Court to order the customary presentence investigation and report before sentence is imposed.

3



11.   The parties agree that the defendant will be required to pay a $100 assessment to the Crime Victims Fund for the Count of conviction.  This assessment is not a fine, but must be paid by any person convicted of a felony.


For The United States of America:
      Robert P. Crouch Jr.
      United States Attorney

by:   _____                ___May 20, 1998___
      Jean B. Hudson                              Date
      Assistant United States Attorney

By the defendant:    _____        5/21/98
      EDWARD ALLEN PINERO                         Date
      a/k/a "Jose Fontaine"                              5/21/98
      _____             _____
      J. Lloyd Snook, Esquire                     Date
      Counsel for PINERO

4

====================================================================

## EXHIBIT B

====================================================================

# ORIGINAL

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA1
FILED

FEB 04 1999

MORGAN E. SCOTT, JR., CLERK
BY: N. Woodard
DEPUTY CLERK

1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF VIRGINIA
2         Charlottesville Division

3

4    UNITED STATES OF AMERICA,        *    Criminal No. 97-39
                                      *
5              vs.                    *    September 9, 1998
                                      *    Charlottesville, Virginia
6    EDWARD ALLEN PINEIRO,            *    3:15 p.m.
                                      *
7              Defendant.            *
     * * * * * * * * * * * * * * * *

8

9

             TRANSCRIPT OF SENTENCING HEARING
10     BEFORE THE HONORABLE JAMES H. MICHAEL, JR.
               UNITED STATES DISTRICT JUDGE
11

12

13   APPEARANCES:

     For the United States:    U.S. Attorney's Office
14                             JEAN B. HUDSON, ESQ.
                               255 W. Main St.  Room 104
15                             Charlottesville, VA 22902

16   For the Defendant:        LLOYD SNOOK, III, ESQ.
                               108 Fifth St. S.E. #210
17                             Charlottesville, VA 22901

18   Court Reporter:           Sonia Ferris, RPR
                               U.S. Court Reporter
19                             255 W. Main St.  Room 304
                               Charlottesville, VA  22902

20

21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

57

2

1    (Interpreter sworn)

2        THE COURT: Good afternoon.

3    Madam Clerk, would you call the case, please?

4        THE CLERK:   Yes, Your Honor.

5    This is Criminal Action Number 97-39C, United States of

6    America versus Edward Allen Pineiro.

7        THE COURT: Thank you.

8    Mr. Pineiro is present in proper person, accompanied by

9    his counsel, Mr. Snook.  The United States is represented by

10   Mrs. Hudson.

11   This comes on for sentencing and before we begin, Mr.

12   Pineiro, I tell you that at the proper time, you will be

13   afforded the opportunity to speak to the Court, to make any

14   statement you wish, whether about sentencing or anything

15   else.  That's known as the right of allocution and it will

16   be given you at the proper time.

17   Now, has Mr. Pineiro, together with all counsel, had

18   full opportunity to review the pre-sentence report?

19       THE DEFENDANT: Yes.

20       MR. SNOOK: Yes, Your Honor, we have.

21       MS. HUDSON: Yes, Your Honor, we have.

22       THE COURT: That report is being placed in the

23   record under seal.  On any appeal, of course, appellate

24   counsel will have full access to the report without further

25   order of the Court.  No information has been withheld from

1    the report, pursuant to Rule 32.  What you have before you

2    is what the Court has before it.

3        Mr. Snook, do you have any problems arising from the

4    pre-sentence report?

5        MR. SNOOK:  Your Honor, we had filed an objection.

6    I have -- since receiving the Government addendum or the

7    probation officer's addendum, I went over the matter in some

8    detail with Mr. Pineiro and whether it was newly detailed

9    questioning on my part or newly refreshed recollection on

10   his, either way, his recollection at this point is, as

11   similar to what the probation officer proved from his

12   investigation, that, in fact, he received one sentence on

13   one day, another sentence on another day.  The confusion in

14   his mind stems, I believe, from the fact the second time,

15   they specifically said it is to run concurrent with the

16   first time and expressed it in terms and suggested it was

17   all one sentence.  But I think under the guidelines, the

18   probation officer is correct.  So our objection, I think, is

19   not well-founded.

20       THE COURT: All right, sir.  We'll treat it as

21   withdrawn and I must say that in looking at the record, it

22   seems to me that that is an appropriate analysis, Mr. Snook.

23       Any other issues?

24       MR. SNOOK: No, Your Honor.

25       THE COURT: Do you find any such issues, Miss

1   Hudson?

2           MS. HUDSON: No, Your Honor.  Thank you.

3           THE COURT: Under those circumstances, the Court

4   will go on to the offense level and criminal history

5   category.

6       In doing so, the Court has looked carefully at the

7   pre-sentence report.  It accords with what the Court knows

8   of the case and is in proper form.  Therefore, it will be

9   accepted and relied on.

10      In doing so, we turn to paragraph 13, which shows a

11  base offense level of 34, reduced by three points for

12  acceptance of responsibility, but then increased by three

13  points for the chapter four enhancement and that is reduced

14  again by three points -- well, that increases it to 37,

15  reduced by three points and gives a total offense level of

16  34.

17      On the criminal history category, we find three points

18  at paragraph 25, three points at paragraph 26, which gives a

19  subtotal criminal history score of six and because this

20  offense was committed less than two years following Mr.

21  Pineiro's release from custody, two points are added, giving

22  a total criminal history points of eight, which establishes

23  a criminal history category of IV.  But because the

24  Defendant is a career offender, that criminal history

25  category must be VI.

1       Are you in accord with those calculations, Mr. Snook?

2              MR. SNOOK: Yes, Your Honor.

3              THE COURT: Mrs. Hudson?

4              MS. HUDSON:  Yes, Your Honor.

5              THE COURT: The Court is not aware of any other

6   materials to come forward concerning sentencing other than

7   what is contained in the pre-sentence report.

8       Are you aware of any such materials which should have

9   come forward but have not, Mr. Snook?

10             MR. SNOOK: Your Honor, I was given today a letter

11  which I've shared with Ms. Hudson.  It doesn't bear on the

12  Sentencing Guidelines, but Mr. Pineiro would like the Court

13  to receive it.  It's from his teacher at the jail (handing).

14             THE COURT: Absent any objection, the Court will

15  receive it.

16      Sir, the Court has seen this and I thank you for

17  tendering it.

18      Mark it, please, Madam Clerk.

19             MR. SNOOK: Your Honor, Mr. Pineiro had given to me

20  when I spoke to him last week in anticipation of what we

21  thought was going to be a hearing last week, had given me a

22  number of certificates of completions for various Bible

23  study classes. I neglected to bring them today.  I hope the

24  Court will accept my representation he completed seven or

25  eight Bible study classes.  It doesn't reflect on the

1    guidelines, but it tells you what he has been up to in the

2    last six or seven months.

3            THE COURT: Unless there's objection, I accept it

4    as a proffer and find it commendable that Mr. Pineiro has

5    done these things.

6        Anything further?

7            MR. SNOOK: No, Your Honor.

8            THE COURT: Do you know of any such materials, Mrs.

9    Hudson?

10            MS. HUDSON:  No materials, Your Honor.

11        I wanted to point out for the record that simply as a

12    point to be made on the record that when Mr. Pineiro's

13    criminal history was researched, the name that came back,

14    which Mr. Snook is aware of, came back to Jose Fontaine,

15    which is a listed alias in the pre-sentence report, and I

16    want to make the point to the Court, technically, we really

17    don't know whether Mr. Pineiro is Mr. Fontaine or Mr.

18    Pineiro but rather, when he was arrested, apparently he was

19    using the name Fontaine at that point.  At the juncture he

20    was arrested in this case, he was using the name Pineiro.

21        I wanted the record to reflect the criminal history,

22    which is the basis for the Court's calculations here, did

23    come back under the name Fontaine.

24            THE COURT: Well, I'm certain the record as you

25    have made it will reflect that Mr. Pineiro has used two

1  names and I don't know that anybody is prepared right now to

2  say which is which, but be that as it may, this is now a

3  matter of record.

4          MS. HUDSON: Thank you, Your Honor.

5          THE COURT: Do you have any response, Mr. Snook?

6          MR. SNOOK: No, Your Honor, I will state I believe

7  the probation officer's investigation would strongly suggest

8  that his real name is Pineiro.

9          THE COURT: All right, sir.

10         Do you wish to offer any evidence, Mr. Snook?

11         MR. SNOOK: No, Your Honor.

12         THE COURT: Ms. Hudson?

13         MS. HUDSON: No, Your Honor.

14         THE COURT: All right, Mr. Pineiro.  I told you

15  that you would have the right at the proper time to speak to

16  the Court.

17         THE INTERPRETER: Now?

18         THE COURT: Now is the time.

19         THE INTERPRETER: Your Honor, I know I was doing

20  wrong things because I'm human.  I'm not perfect.  But my

21  mind now is to change my life because I have a beautiful

22  family and he was having the problem in his whole family.  I

23  feel very ashamed because of the community and my family.

24  But I think that this is the time for me to change my mind

25  and to think like an honest man and I thank God for being

1   able to receive the Bible in my mind and in my heart because
2   life has taught me now the difference between right and
3   wrong.  I know I'll be sentenced today, but I'm a human
4   being and I have a human heart.  I know that you're an
5   educated man with a human heart and I want you to have mercy
6   on me because I have a wife and a son who depend on me and I
7   want all present to excuse me for my mistakes.  That's what
8   I had to tell you.
9            THE COURT: Thank you, Mr. Pineiro.
10           THE DEFENDANT: Thank you, sir.  Thank you, Your
11  Honor.
12           THE COURT:  Anything further, Mr. Snook?
13           MR. SNOOK: No, Your Honor.
14           THE COURT: Anything further, Ms. Hudson?
15           MS. HUDSON: No, Your Honor.  Thank you.
16           THE COURT: Mr. Snook, I'll be glad to hear from
17  you on behalf of Mr. Pineiro.
18           MR. SNOOK: Your Honor, the Sentencing Guidelines
19  clearly give you no choice in this matter but to give Mr.
20  Pineiro at least a sentence of 262 months.  That, as the
21  Court can do the math, is 20 plus, 22 years, I guess. I note
22  that Mr. Pineiro, aside from drug-related offenses, does not
23  apparently have any other record.  I would be the first to
24  acknowledge that given the use of aliases, it may be an
25  imperfect conclusion, but nonetheless, because we've been

1   able to track even these by fingerprints, I think we can

2   fairly conclude this is it.

3        He has a drug problem, has used drugs, has dealt drugs,

4   has been around drugs for a long time, has become a part of

5   that culture and obviously is paying the price at this point

6   and will pay the price for 20-something years.

7        I will simply state to the Court, given the range of

8   262 to 327 months, given the kinds of much more heinous

9   records this Court may see coming before you, people who

10  have gotten to the career criminal stage for violent crimes

11  and so on and are at that same 262 to 327 range; that yes,

12  it's true, Mr. Pineiro has earned his status as a Category

13  VI, but he has also, I think, not earned it to the same

14  degree that many of the people who have come before this

15  Court have and I would ask the Court to sentence him at the

16  bottom end of that guideline range, recognizing that that

17  still is going to hold him for another 20 years.

18            THE COURT: Thank you, sir.

19       Mrs. Hudson?

20            MS. HUDSON: Your Honor, I agree that the range

21  gives the Court not a lot of leeway in where to sentence Mr.

22  Pineiro.  The only remark I wanted to make was that in

23  response to Mr. Pineiro's statement to the Court,

24  unfortunately, for the rest of the community in which he

25  dealt drugs, although he asks the Court's mercy because he

1  has a family which is dependent on him, his concern was

2  never for the community and the families here and elsewhere

3  where there are also families with wives and sons dependent

4  on fathers who were buying cocaine and making their habits

5  worse and maybe going away to jail themselves.  I think

6  there is incalculable damage whenver there is a drug dealer

7  who was dealing on the level Mr. Pineiro was.

8        Beyond that, he's obviously, because of his criminal

9  history and his career offender status, had a number of

10  opportunities to have come to the same decision earlier in

11  which case he wouldn't be here at all.  It was a choice he

12  had that he made and we'd ask the Court now to sentence him

13  within the appropriate guideline range of 262 to 327 months.

14            THE COURT: Anything further, Mr. Snook?

15            MR. SNOOK: No, sir.

16        Your Honor, if I might, Mr. Pineiro asked me to make

17  one other comment to the Court, if I could.

18            THE COURT: Sure.

19            MR. SNOOK: We'd simply like to note, and I believe

20  this is reflected in the pre-sentence report or come to

21  think of it, I know it was brought out when the officer

22  testified at the guilty plea stage, that the reason that

23  they were able to catch Mr. Jose or Jorge was because of Mr.

24  Pineiro's cooperation immediately after his arrest and while

25  some of the numbers weren't quite right on the addresses,

1   they were able to catch him, arrest him, prosecute him,

2   convict him and he is to be sentenced, as well.  I ask the

3   Court to consider that his immediate cooperation with the

4   authorities was able to be of some assistance to the

5   Government, as well.

6        Thank you.

7             THE COURT: Do you wish to respond, Ms. Hudson?

8             MS. HUDSON: If I could have just a moment, Your

9   Honor.

10       (Ms. Hudson conferred with case agent)

11       Your Honor, I don't have anything further to add.

12            THE COURT: Part of the problem with trying to find

13  an appropriate sentence in this case, aside from the issue

14  of the guidelines, is the amount of crack cocaine involved.

15  The pre-sentence report indicates that Mr. Pineiro could be

16  held responsible for at least 200 plus grams of cocaine

17  base.  That is a great deal of crack cocaine.  It's not up

18  in the kilogram range, but when looking at both Defendants,

19  it may be that what they distributed reached into that

20  range.  But regardless of that, it appears clear that there

21  were at least 200 grams.  The Court must agree with Mrs.

22  Hudson's view that the damage caused by crack cocaine

23  generally, and particularly in the larger amounts, is simply

24  not a calculable figure.  All we can say is we know it has a

25  disastrous effect on the user and the family of the user.

1  But that's as far as we can go with trying to determine, to

2  quantify, what the effect of this distribution may be.

3  That's a matter of particular concern to this Court.

4      It cannot be said that Mr. Pineiro's distribution

5  amount is startlingly high considering some of the cases

6  which have come before this Court.  But it certainly is high

7  enough to give the Court grave concern.

8      On the plus side in Mr. Pineiro's case, as Mr. Snook

9  has pointed out, his previous record relates almost

10  exclusively to crack cocaine, aside from some sort of

11  scuffle with the police officers in one instance.  There's

12  no sign of any violence in Mr. Pineiro's history.

13      It's additionally true that to some degree, Mr.

14  Pineiro's cooperation assisted, as the Court recalls the

15  evidence, in the apprehension of his co-defendant in New

16  York.  The co-defendant may very well have been caught, in

17  any event.  It seems likely that is the case.  He was in New

18  York, according to all the Court knows about it, to buy

19  additional crack cocaine or additional cocaine.  But

20  nonetheless, to the extent that Mr. Pineiro's information

21  was helpful, it did help in the apprehension of his

22  co-defendant.

23      The Court is aware of the family situation to which Mr.

24  Pineiro spoke.  It brings so firmly home to the Court again

25  that the penalty suffered by the Defendant is only a minor

1    part of the offense penalty because the remainder of that

2    penalty is applied to the family.  It's the family that

3    suffers far more than the Defendant.  But our system has not

4    yet resolved any way to solve or ameliorate that particular

5    situation.

6        Under the circumstances of this case, the Sentencing

7    Commission has laid down guidelines which are to be followed

8    by this Court, absent some motion from the Government and

9    there is none, or some extraordinary circumstance that would

10   justify either upward or downward departure, and the Court

11   finds no such circumstances in either direction in this case

12   and therefore, it is constrained by the guidelines which the

13   Sentencing Commission has set out, so-called guidelines,

14   misnomer of the first order.  They amount to directives.

15   That being the case, there's little room for operation of

16   this Court's judgment -- there is no room for operation of

17   this Court's judgment in fixing a sentence.

18       Mr. Pineiro, are you ready for the Court to pronounce

19   sentence in your case?

20            THE INTERPRETER: Yes.

21            THE COURT:  Does counsel know of any reason why

22   sentence should not now be imposed?

23            MR. SNOOK:  No, Your Honor.

24            MS. HUDSON: No, Your Honor.

25            THE COURT:  For the reasons indicated by the Court

1   and in particular reference to the mandate, and I use the

2   word advisedly, mandate, of the Sentencing Commission

3   guidelines, it is the judgment of the Court, Mr. Pineiro,

4   that you be committed to the custody of the Bureau of

5   Prisons, to be imprisoned for a term of 260 months -- is it

6   60 or 62?

7           MR. SNOOK: 262, Your Honor.

8           THE COURT: -- on each of Counts 1, 2 and 3, all to

9   be served concurrently.

10      On release, you'll be placed on supervised release for

11  a term of five years, 60 months.  This term consists of 60

12  months on each of Counts 1 and 2 and a term of 48 months on

13  Count 3, all to run concurrently.

14      Within 72 hours of release from the custody of the

15  Bureau of Prisons, you shall report in person to the

16  probation officer in the district in which you're released.

17      While on supervised release, you shall not commit

18  another crime, federal, state or local.  You shall not

19  illegally possess a controlled substance and you must comply

20  with the standard conditions of supervised release adopted

21  by this Court.

22      Because the offense occurred after 13 September, 1994,

23  I tell you again that you must refrain from any unlawful use

24  of a controlled substance.

25      You shall submit to one drug test within 15 days of

1  placement on supervised release and at least two periodic

2  drug tests thereafter, as directed by the probation officer.

3  Further, you shall participate in a program of testing and

4  treatment for substance abuse, as directed by the probation

5  officer, until such time as you are released from the

6  program by him.

7      You shall not possess a firearm or any form of

8  destructive device and shall reside in a residence free of

9  such firearms and destructive devices.  You shall submit to

10  warrantless search and seizure of your person and property,

11  as directed by the probation officer, to determine whether

12  you are, in fact, in possession of illegal controlled

13  substances or firearms.

14      The Court finds you do not have the ability to pay a

15  fine within the guideline range, but that you can pay a fine

16  below that range by participating in the Inmate Financial

17  Responsibility program administered by the Bureau of

18  Prisons. To that end, that is, your participating in that

19  Financial Responsibility program, the Court will impose a

20  fine in this case of $500, consisting of $500 -- $600, on

21  each of Counts -- I back up.  Wait a minute.  Let me get

22  this straight.  I will impose a fine of $600 total, which

23  consists of $200 on Count 1, $200 on Count 2, $200 on Count

24  3 and further, the Court must require that you pay a special

25  assessment, not a fine, but an assessment of $300 paid over

1   into the Crime Victim Assistance fund.

2       I must tell you, Mr. Pineiro, that you have the right

3   to appeal any sentence which this Court imposes.  If you do

4   not have counsel, counsel will be appointed for you for that

5   appeal, but I will rely on Mr. Snook to advise you further

6   about your rights of appeal.

7       Is there anything further we can do in the case at this

8   point, Mrs. Hudson?

9           MS. HUDSON: No, Your Honor.  Thank you.

10          THE COURT: Anything further, Mr. Snook?

11          MR. SNOOK: Your Honor, I don't know whether this

12  is an appropriate thing for the Court to include in the

13  order.  You indicated your desire to have Mr. Pineiro

14  receive drug treatment upon his release.  If the Court could

15  also make some suggestion that he receive drug treatment

16  while in the custody of the Bureau of Prisons, I think that

17  would also help.

18          THE COURT: I will recommend in the judgment and

19  commitment order that he receive the most extensive drug

20  counselling program that is available in the Bureau of

21  Prisons.

22          MR. SNOOK: Thank you, Judge.

23      (Defendant conferred with Mr. Snook.)

24      Nothing further, Judge.

25          THE COURT: With those circumstances, we'll adjourn

17

```
 1   for the day.

 2        (Proceedings concluded at 3:45 p.m.)

 3

 4   "I certify that the foregoing is a correct transcript from

 5   the record of proceedings in the above-entitled matter.

 6

 7

 8   Soria Ferris                        2/4/99        "

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**March 9, 2005**

## Tenth Circuit addresses *Blakely* retroactivity

*[handwritten: NOT RETROACTIVE]*

Standing out among other circuit dispositions this week is the Tenth Circuit's discussion of *Blakely*'s retroactivity in *US v. Price*, 2005 WL 535361 (10th Cir. Mar 08, 2005). The petitioner in *Price* had failed on his habeas claim in the wake of *Blakely*, but he sought rehearing after *Booker*, and the Tenth Circuit denies the rehearing petition with an opinion that provides an extended explanation for why "*Blakely* does not apply retroactively to convictions that were already final at the time the Court decided *Blakely*, June 24, 2004."

The Tenth Circuit thus becomes, I believe, the third circuit to address directly *Blakely/Booker* retroactivity after *Booker*, joining the Seventh Circuit in *McReynolds* and the Sixth Circuit in *Humphress*. Unlike the plain-error splits for cases still on direct appeal, the circuits have been uniform to date in rejecting *Blakely/Booker* challenges in cases that have become final.

**UPDATE:** As Adam kindly notes in the comments to this post and as another fine reader has brought to my attention, I keep forgetting that the [...] *Varela* has also ruled that that *Blakely* and *Booker* are not retroactively applicable to cases [...] collateral review. So, we have four circuits that have officially spoken on this issue — the 6th, 7th, 10th and 11th — and I suspect that it is only a matter of time before the other eight follow suit

*[handwritten: 4 CIRCUITS THIS FAR HAVE RULED THAT Booker & Blakley Not Retroactive 6th, 7th, 10th, 11th]*

March 9, 2005 at 06:09 AM | Permalink | Comments (1) | TrackBack (0)

## Comments

The Eleventh Circuit has ruled similarly in Varela v. United States.

## Ask and ye shall receive ... *Booker* data

In this post yesterday, I noted my eagerness for post-*Booker* data. Thanks to the kind folks at the US Sentencing Commission, I now have (and can share for downloading below) the USSC's "last complete data cut" which was prepared on February 23 and reflects all post-*Booker* cases received by the USSC as of February 17. (These materials are also now posted on the USSC's *Booker Reform* page.)

These data reports cover 2,056 total cases, though in the USSC's analysis 70 cases had to be excluded due to incomplete or missing information. Thus, for the five weeks post-*Booker*, we have nearly 2000 cases to chew on (which is, of course, only one-third of what would have moved through the system if it were operating at a pre-*Booker* pace of 1,200 cases/week). The data is fascinating and the memos below are so clear (and brief) that I will let them speak for themselves. Importantly, USSC folks indicated that the "next data cut" will be likely taken around the end of this month.

Download the other data memo (228K) at **PRINTED**

Download the other analysis of sentences (116K) at **PRINTED**

March 9, 2005 at 11:32 AM | Permalink | Comments (1) | TrackBack (0)

## Comments

Without examining the cases, it appears from the memo that Booker may actually be working... the number of sentences within the Guideline range has stayed relatively constant, and there are a few more sentences above the Guideline range-- an optimist would say that federal judges are taking the presumptive sentences offered by the